885 F.2d 864
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BOARD OF EDUCATION, MONONGALIA COUNTY, WEST VIRGINIA, a West
Virginia Public Body Corporate, Plaintiff-Appellant,
v.
MELLON-STUART COMPANY, a Pennsylvania corporation,
Construction Cost Consultants, Inc., a
Pennsylvania corporation, Defendants-Appellees.
 No. 88-1768.
 United States Court of Appeals, Fourth Circuit.
 Argued May 11, 1989.
Decided Sept. 8, 1989.
 
 Paul Lambert Selby, Jr. (Mike Magro, Jr., Magro & Magro on brief) for appellant.
 Carolyn M. Branthoover (Donald E. Seymour, James A. Buddie, Kirkpatrick & Lockhart, Jacques R.A. Williams, Hamstead, Hamstead & Williams on brief) for appellees.
 Before PHILLIPS AND MURNAGHAN, Circuit Judges, and FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Appellant Board of Education of Monongalia County ("the Board") filed a seven-count complaint on January 5, 1987, in the Circuit Court of Monongalia County, West Virginia, against appellees Mellon-Stuart Company ("Mellon-Stuart") and Construction Cost Consultants ("CCC"), alleging four causes of action: breach of contract, unjust enrichment, fraud in the inducement and misrepresentation. Appellees removed the case to the United States District Court for the Northern District of West Virginia on February 9, 1987.[1] The district court granted, immediately prior to trial, defendants' motion for summary judgment with regard to the counts for fraud and misrepresentation.[2]
 
 
 2
 On July 8, 1988, the breach of contract and unjust enrichment claims were tried to the court. The district court concluded that no breach of contract had been committed by either Mellon-Stuart or CCC,[3] and that, in any event, the Board had not proven any damages. The district court entered judgment for defendants. The Board then timely noted this appeal.
 
 Facts
 
 3
 Between the years 1976-1981, the Board undertook an extensive construction program consisting of five separate school projects. Those projects included: (1) construction of South Area Junior High School; (2) construction of the Vocational Technical Center; (3) construction of the University High School Gymnasium; (4) construction of North Morgantown Elementary School; and (5) construction of an addition to Clay-Battelle High School. The Board hired an architectural firm for the first project. That firm advised the Board to utilize "construction management" to administer the school projects because "construction management" is said to eliminate the need for a general contractor and to lower the total cost of a project. The Board accepted that recommendation of the architects, conducted interviews with various firms, and ultimately entered into construction management contracts with CCC for each of the five projects.
 
 
 4
 Construction management involves a construction manager working with the owner and architect in planning a budget for each project. The construction manager provides cost advice and scheduling advice in order to reduce the time frame of the entire project; and reviews, and expresses views concerning, drawings presented to him by the architect. The architect and the construction manager jointly supervise the bidding process and recommend to the owner the contractor to which each contract should be awarded. After the architect completes final drawings concerning a project, the construction manager computes a guaranteed maximum price ("GMP") for the owner--that is, a guaranteed cap on the total cost of the project. Thus, in the instant case, when the total cost of a project exceeded the GMP, CCC was required to bear that excess cost or "overage." On the other hand, each contract provided that if the total project cost was less than the GMP, the Board and CCC would split the savings on a 90%-10% basis, with 90% going to the Board and 10% to the CCC. During the work period of each project, CCC was responsible for reviewing applications for payments made by the general trades contractors to the Board before any payments were made.
 
 
 5
 In return for its services, CCC was to be paid 6% of the total cost of each project, plus the 10% savings, if any, discussed supra. In addition, the Board agreed to reimburse CCC for certain reimbursable costs.
 
 
 6
 During 1972-1978, CCC was a wholly-owned subsidiary of Mellon-Stuart Company.[4] While members of the Board may not have been aware of the exact relationship of the companies, and in particular may not have known that many employees were employed by both Mellon-Stuart and CCC, and that all employees were compensated from the same payroll, members of the Board knew that the companies were affiliated. Indeed, the relationship of CCC and Mellon-Stuart was discussed during certain Board meetings, including the meeting during which CCC made its presentation to the Board in support of CCC's quest to be hired as construction manager. From the outset, CCC informed the Board of its relationship with Mellon-Stuart, and also specifically requested the Board to permit Mellon-Stuart to bid for general trades contracts on projects administered by CCC. Mellon-Stuart did bid on, and was awarded as the low bidder, each one of the five general trades contracts for the school projects.
 
 
 7
 Under applicable law in West Virginia during the relevant time period, any construction work in excess of $5,000 was required to be put out for competitive bidding.[5] Consequently, each of the five School Board projects was advertised for public bidding. CCC, as construction manager, was present when the Board opened the bids and then reviewed them in order to make a recommendation to the Board for acceptance.
 
 
 8
 After Mellon-Stuart had been awarded the general trades contracts, CCC discussed with the Board the billing of CCC's reimbursable costs through the Mellon-Stuart general trades contracts. The Board agreed to that method of billing. The billing procedure provided that construction management fees would be taxed at the lower 1.2% West Virginia Business and Occupancy tax for services, rather than the State's 2.2% Business and Occupancy tax applicable to a construction manager's reimbursable costs. Consequently, inclusion of CCC's cost reimbursables with the Mellon-Stuart billings for fees resulted in a tax savings for the Board. That method of billing had been used by Mellon-Stuart and CCC with regard to school projects in West Virginia in areas other than Monongalia County.[6]
 
 
 9
 After acceptance of a bid, the usual practice was that CCC would prepare a form AIA contract in which the total cost of the contract, labelled the "contract sum," would equal the bid amount. However, in the case of the Mellon-Stuart contracts, each AIA contract was not prepared until several months after Mellon-Stuart had begun the work. In addition, the amount designated as the "contract sum" in the Form AIA contracts prepared by CCC was not equal to the stated bid amount. Rather, each contract included the total of the contract bid amount, cost reimbursables, and other expenses.
 
 
 10
 As Mellon-Stuart completed work on the projects, it submitted applications for payment to the Board. Those applications were first reviewed by CCC and then by the project architect, who checked that the work billed had been performed. Each application included "back up" which consisted of a detailed explanation of the reimbursable costs claimed by CCC. The Board paid all of Mellon-Stuart's applications for payment and at no time questioned, until the filing of this lawsuit, any of the items included in connection with those applications.
 
 
 11
 Costs with regard to three of the five projects ultimately exceeded the project GMP, and CCC, as per the contract, bore those costs.[7]
 
 
 12
 Following an audit of the school construction program of the Board, the auditor questioned the payments made by the Board to CCC and Mellon-Stuart in excess of the accepted bid amounts. The auditor advised that the Board take action to recover the alleged excess from each project. This litigation followed.
 
 Breach of Contract
 
 13
 In order to recover damages for breach of contract, a claimant must prove the existence of a contract, breach of that contract and damages. A contract is formed after there has been an offer and an acceptance. An offer is "a manifestation of willingness to enter into a bargain so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts Sec. 24 (1981). An acceptance of the offer by the offeree forms the contract. In this case, the Board asserts that the offer and acceptance culminating in the contracts consisted of each bid by Mellon-Stuart and the acceptance of that bid by formal action taken by the Board at a meeting. The Board asserts that, under those contracts, Mellon-Stuart promised to perform construction work on the five projects at the stated bid prices. Appellees, however, contend that, in any event, those contracts were modified by a subsequent agreement of the parties concerning the inclusion by Mellon-Stuart, as part of its billings, of CCC's cost reimbursables. Alternatively, appellees argue that the written and executed AIA form contracts, which reflected the modifications, constituted the contracts between the Board and Mellon-Stuart. As discussed infra, it is irrelevant which of those alternatives constituted the agreements between the parties, because the Board has not proved any breach of contract any damage under any alternative.
 
 
 14
 The trial court found that the Board had agreed to compensate CCC in accordance with a flat 6% rate plus reimbursable costs. The trial court also found that the Board had agreed that CCC's cost reimbursables could be billed through the Mellon-Stuart general trades contracts. Therefore, while the trial court did not explicitly address appellant's argument that the contracts were formed on the basis of the bids and acceptances of the bids rather than in the context of the AIA form contracts, the trial court implicitly determined that the Board had agreed to modify the contracts to allow the billing of CCC's cost reimbursables through Mellon-Stuart billings. West Virginia law provides that, for consideration, an existing contract may be modified. W.L. Thaxton Construction Co. v. O.K. Construction Co., Inc., 295 S.E.2d 822, 825 (W.Va.1982); John W. Lodge Dist. Co., Inc. v. Texaco, Inc., 161 W.Va. 603, 245 S.E.2d 157, 159 (1978). Consideration sufficient to support a contractual undertaking is "a benefit to the promisor or a detriment to the promisee." First National Bank v. Marietta Mfg., 151 W.Va. 636, 153 S.E.2d 172, 177 (1967). While the Board takes the position that there was no consideration for a contract modification, that position overlooks the fact that the Board was never billed by CCC for the cost reimbursables other than through Mellon-Stuart billings. Thus, in effect, the undertakings of the Board, which were included in the written Form AIA contracts, to pay amounts for CCC cost reimbursables were supported by Mellon-Stuart's agreement to undertake the work which gave rise to the cost reimbursable items.[8]
 
 
 15
 The Board contended at trial that CCC and Mellon-Stuart breached their contracts by billing the Board for nonreimbursable construction costs incurred by Mellon-Stuart under the guise of billing those costs as legitimate cost reimbursables incurred by CCC. The trial court's findings of no breach by CCC or by Mellon-Stuart of any contractual obligation and also of no damages are well and sufficiently supported by the evidence.
 
 
 16
 In actions for breach of contract, the law seeks to put the nonbreaching party in the position in which he would have been but for the breach, 5 Corbin on Contracts Sec. 992 (1951), in order to protect what have been termed as "expectation," "reliance," or "restitution" interests of the nonbreaching party. Restatement (Second) of Contracts Sec. 344 (1981). While a party who can demonstrate a breach but can demonstrate no injury may be entitled solely to nominal damages, 11 Williston on Contracts Sec. 1339A (1920), the nonbreaching party is generally entitled only to "recoverable damages ... proved with reasonable certainty." Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro, 158 W.Va. 708, 214 S.E.2d 823, 828 (1975). It is the nonbreaching party's burden to prove damages and the alleged breaching party bears no burden to disprove claimed damages. In this case, the Board sought a restitution-type remedy from CCC and Mellon-Stuart in an amount equal to the sum total of the difference between each bid amount and the amount billed under each AIA contract.
 
 
 17
 The trial court's findings in this case, including the findings that the Board suffered no damages, are reviewable under the clearly erroneous standard. Shrader v. White, 761 F.2d 975, 980 (4th Cir.1985). The Board produced no evidence that either CCC or Mellon-Stuart failed to perform work which together they were obligated contractually to perform. The only claimed breaches were that CCC billed nonreimbursable costs through Mellon-Stuart and that the Mellon-Stuart contracts did not conform to the accepted bids. The Board attempted to prove both breach and damages by demonstrating, through the testimony of Ward Stone, an attorney and a member of the school board at the time the construction projects were underway, the discrepancies between the amounts of the bids submitted by Mellon-Stuart and the amounts shown in the AIA contracts signed several months later. No attempt was made by the Board to prove any other specific items of damage. Also, it is to be noted that Mellon-Stuart submitted detailed "back up" with each application for payment showing all costs incurred.
 
 
 18
 The evidence at trial fully supports the trial court's determinations that the Board agreed that CCC's compensation would include a 6% rate plus cost reimbursables. In addition to the testimony of several of Mellon-Stuart's witnesses who stated that the Board agreed to pay CCC a flat 6% rate plus cost reimbursables, Dr. Lawrence Derthick, a former superintendent of schools in Monongalia County during part of the time period at issue, so testified. Also, several other witnesses testified that the parties discussed the method of billing and determined to proceed as they did in order to take advantage of the lower tax rate with regard to services. Further, as to lack of damages, a number of witnesses testified on behalf of Mellon-Stuart that all of the costs billed to the Board in connection with Mellon-Stuart contracts were cost reimbursables actually incurred by CCC and that the Board did not pay more under the billing system which was adopted than it would have paid had CCC submitted separate billings for cost reimbursables. That testimony stood unrebutted at trial. Further, Robert Evans, vice-president for project management of Mellon-Stuart, testified that applications for payment were presented with invoices attached, in order to supply supporting detail.
 
 
 19
 Glenn Walker, a certified public accountant who performed annual audits for the Board during the years covering the construction projects at issue in this case, testified that the Board's payments to Mellon-Stuart and CCC were in accordance with the signed contracts and the authorized change orders. Terence Kiliany, the assistant secretary and assistant treasurer of Mellon-Stuart, testified that prior to the commencement of the litigation, he reviewed and prepared a schedule of all of the contracts for each of the five projects and concluded that the Board did not pay in excess of the original contracts and the authorized change orders.
 
 
 20
 Therefore, regardless of whether the contracts between the Board and Mellon-Stuart are deemed to be the accepted bids, oral modification of those bids, or the executed AIA form contracts, or any combination of the same, the Board has proved no damages. CCC was entitled to payment for its cost reimbursables; the method of billing used by appellees did not affect the amounts which the Board was obligated, in any event, to pay and did pay. Thus, the Board has failed to prove that any cost reimbursables claimed by CCC were improper.
 
 
 21
 In the context of the record in this case, this court finds no error in any of the trial court's findings of fact or conclusions of law. Therefore, the judgment of the district court is
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 The case was so removed pursuant to 28 U.S.C. Secs. 1441 and 1446. The Board is a citizen of the State of West Virginia with its place of business in West Virginia. CCC and Mellon-Stuart are corporations organized under the laws of Pennsylvania with their principal places of business in Pennsylvania
 
 
 [2]
 No appeal has been taken with respect to those rulings by the trial court with regard to the claims of fraud and misrepresentation
 
 
 [3]
 While the district court did not specifically rule concerning the unjust enirchment issue, its holding with regard to the contract claims and its findings and reasoning with regard thereto make it clear that, in its view, there was not only no breach of contract but also no unjust enrichment since CCC and Mellon-Stuart together received only--and no more than--what they together were entitled contractually to receive
 
 
 [4]
 In 1978, a merger of CCC and Mellon-Stuart left Mellon-Stuart as the surviving company
 
 
 [5]
 W.Va.Code Sec. 18-5-12a has since been repealed by the West Virginia legislature
 
 
 [6]
 The West Virginia State Department of Taxation audited all of the records of Mellon-Stuart and CCC and determined that the lower tax rate could properly be used with respect to the CCC service contract. The Department of Taxation raised no questions regarding the billing of cost reimbursables through the Mellon-Stuart bills rather than through CCC bills
 
 
 [7]
 Construction costs for the Votech Center exceeded the GMP by $7,803.21; costs for South Junior High exceeded the GMP by $15,783.12; and costs for Clay-Battelle High School exceeded the GMP by $23,245.48
 
 
 [8]
 The Board also argues that the trial court erred in finding a valid modification of the contract between the Board and Mellon-Stuart, because a Board of Education can contract only in public meeting "as a corporate act." Because the agreement to modify the contract is not reflected in any of the minutes of any meeting of the Board, the Board contends that no such corporate act was taken with respect to the modification. However, a Board may act through its "authorized agents," Pennsylvania Lightning Rod Co. v. Board of Education, 20 W.Va. 360, 369 (1882), and there seems to be no question but that the Superintendent of Schools, who executed each one of the Mellon-Stuart AIA contracts at issue on behalf of the Board, is such an agent. There has been no suggestion by the Board that the Superintendent acted outside the scope of his authority in any way when signing each of the contracts
 In any event, this point is, in practical effect, academic in view of our affirmance of the trial court's determination that the Board suffered no damages through the billing procedure used by CCC and Mellon-Stuart.